Thomas Blaney, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued March 6, 1981, before Judges ROGERS, MACPHAIL and PALLADINO, sitting as a panel of three.

*Stewart A. Burnstein*, with him *Patricia L. Smith*, for petitioner.

*Stephen B. Lipson*, Assistant Attorney General, with him *Richard Wagner*, Chief Counsel, and *Harvey Bartle, III*, Attorney General, for respondent.

OPINION BY JUDGE ROGERS, April 3, 1981:

Thomas Blaney seeks review of a decision of the Unemployment Compensation Board of Review holding him ineligible for benefits because he was

discharged from his employment for his wilful miscon-
duct. Section 402(e) of the Unemployment Compensa-
tion Law, Act of December 5, 1936, Second Ex. Sess.,
P.L. (1937) 2897, *as amended*, 43 P.S. §802(e).

This is another matter in which the employer failed
to produce evidence at the referee's hearing and in
which crucial compensation authorities' findings un-
favorable to the claimant were based on hearsay in the
form of written statements provided by the employer.
There had been a rumor, false it seems, spreading
through the employer's company that an employee, ap-
parently a friend of the claimant, was going to be
discharged for theft. This finding is not contested.

The crucial findings in this case, and the evidence,
were:

> 3. The claimant was questioned as to his
> knowledge of the rumor and where it started.
> Claimant had a position of responsibility with
> the company and was expected to cooperate in
> the investigation since the false rumor was
> hurting personnel relationships.

The second sentence of this finding is lifted almost ver-
batim from the written statement of one Joseph
Pilgrim, the employer's vice president for administra-
tion, to which the claimant objected as hearsay and
which therefore should not have been used as the basis
of any finding.

> 4. The claimant would not give the names
> of employees who supposedly spread the rumor
> and refused to cooperate in the investigation.

The support suggested by the Board for this finding is
the claimant's answer to the following question ap-
pearing on an Office of Employment Security Form he
was required to complete:

5. Reason for Separation or Partial Unemployment

[ ] Lack of Work (Material shortages, no orders, etc.)

[ ] Other. Explain Below in Detail

_____

_____

The claimant placed an "x" in the "Other" block and wrote on the lines beneath:

Was confronted with spreading false rumors. Would not cooperate with company investigation.

The Board says that these statements support its finding that the claimant did not cooperate in the investigation. This is not so; they were truthful answers to the questions on the forms. They described the reason the employer gave for discharging him. In this connection, we are mindful that the compensation authorities quite properly, in our opinion, find fault overpayments against claimants for giving false reasons for their discharge. A claimant's answer to a question cannot in fairness be treated as a disqualifying admission if it is a truthful statement of the reason given by the employer for discharging him and as a ground for recouping benefits from him if it is false.

It is true that on still another written statement requested by the Office of Employment Security the claimant wrote "I was fired ... because I would not reveal the name [sic] of individuals who started the rumor which I heard about." This again merely recites why his employer fired him. It is not an admission that he would not reveal names. This is shown first by the fact that in a third statement filed later the claimant declared that he believed that he was discharged as a rumor-monger because he asked a secretary in the employer's shipping office if it was true that his friend had been discharged.

The claimant's testimony on the points at issue was as follows:

A: I was coming back from lunch and what I did was walk by the front steps and there was three or four people that I work with there in management standing on the front steps and I only had about two or three minutes to get in and as I was coming in the people were discussing something that I overheard.

Q: Would you tell the referee what you overheard?

A: I overheard a discussion of a gentleman that used to work for me in the plant ... being fired and I said is this true and the group said yes.

....

Q: Alright, would you tell the referee the extent of that conversation?

A: Okay, Mr. Pilgrim came into me and he said he traced the rumor to me. And he asked me if I did hear this rumor and I said yes that it was all over the building. So he proceeded to tell me who told you the rumor and I stated to him, Mr. Pilgrim there is more than one individual involved here. I don't think it would be fair to just give one name. Mr. Pilgrim said to me, you are not going to give me one name and I said Mr. Pilgrim, there is more then one name, one individual involved. With that he said to me, Tom you have been missing a lot of time. Tom you seem very unhappy around here of late and you've been missing a lot of time sick. Mr. Pilgrim was aware I was on medication.

....

Q: What was your intention, what did you mean it was more than one person?

A: Well when I came up, in other words, I wasn't in the conversation. There was a group talking and the whole group was discussing this thing and I says you know and somebody said you know let's let Tom know about this.

Q: Were you willing to give the name of the entire group?

A: Yes sir, I was.

Q: Was there any name suggested to you as the possible source of the rumor?

A: Yes sir.

....

A: During the conversation after I made a statement that there was more then one individual involved, he said was it Clarence Thompson.

Q: And what did you say?

A: I said to him there was more then one individual involved Joe. I don't think it's fair to name one guy.

Clarence Thompson was one of the group of men whose discussion the claimant joined as he described in his testimony. We do not believe that the claimant's failure to confirm Mr. Pilgrim's suspicions concerning Thompson — a single instance of departure (if it was such) from some ideal of the loyalty one owes his employer — fits any of the definitions of wilful misconduct accepted by this Court. "In all these definitions there is an element indicating a consciousness of wrongdoing on the part of the employe. The use of such words as 'wanton or willful,' 'deliberate,' 'disregard,' 'intentional,' and 'negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design' indicates that an employe is only guilty of wilful misconduct when he is, or should be, under the circumstances, conscious that his actions are inimical to the interest of his employer." *MacFarlane*

v. *Unemployment Compensation Board of Review*, 12
Pa. Commonwealth Ct. 550, 554, 317 A.2d 324, 326
(1974). There is no competent evidence in this record
showing a conscious indifference on the part of the
claimant to his employer's interests. The case is very
like *MacFarlane, supra,* where we held that the failure
of the employee to list a physical defect, previously
orally disclosed, on an employment form was not an
act so consciously inimical to the employer's interest as
to be disqualifying.

Order reversed.

ORDER

AND NOW, this 3rd day of April, 1981, the order of
the Board of Review is reversed and the record is
remanded for computation of benefits.

This decision was reached prior to the expiration of
the term of office of Judge WILKINSON.